# EXHIBIT A

CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone: (212) 655-6000
Michael Friedman
David T. B. Audley
Eric S. Silvestri

*Counsel to AYH Wind Down LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| **ALL YEAR HOLDINGS LIMITED,** | : | Case No. 21-12051 (MG) |
| Debtor. | : | |
| **AYH WIND DOWN LLC**, through Ofer Tzur and Amir Flamer, solely in their joint capacity as Claims Administrator | : | |
| Plaintiff, | : | |
| **ALEXANDER M. ENGELMAN,** | : | Adversary No. 23-01196-mg |
| Defendant. | : | |

**FIRST AMENDED ADVERSARY COMPLAINT**

AYH Wind Down LLC ("**Wind-Down Co**"), through Ofer Tzur and Amir Flamer jointly as Claims Administrator, respectfully shows and alleges as follows:

**PRELIMINARY STATEMENT**

Following confirmation of the *Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 289] (the "**Plan**"), and pursuant to the *Findings of Fact,*

*Conclusions of Law, and Order Confirming Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited* [ECF No. 352] (the **"Confirmation Order"**), certain of All Year Holdings Limited's (the **"Debtor"**) claims vested with Wind-Down Co. The Claims Administrator (as defined below) is vested with power and authority to pursue those claims on behalf of Wind-Down Co. This lawsuit is one such claim, specifically a breach of promissory note action.

### PARTIES, JURISDICTION, AND VENUE

1. The Plaintiff in this matter is Wind-Down Co, which, as alleged further below, possesses certain of the Debtor's claims following reorganization under the Plan.

2. This claim is brought on behalf of Wind-Down Co by Ofer Tzur and Amir Flamer solely in their joint capacity as Claims Administrator on behalf of Wind-Down Co (the "**Claims Administrator**") pursuant to the Plan and that certain Plan Administration Agreement (**"the Plan Administration Agreement"**).

3. Under the Plan Administration Agreement, which was executed in conjunction with the effectiveness of the Plan, Ofer Tzur and Amir Flamer were jointly appointed Claims Administrator. Specifically, the Plan Administration Agreement states:

> The Administrators hereby (a) accept their respective appointments as the Plan Administrator and the Claims Administrator as of the Effective Date, and (b) agree to observe and perform all duties and obligations imposed upon each of the Administrators under this Agreement, the Plan and the Confirmation Order, and other orders of the Bankruptcy Court as made expressly applicable to the Plan Administrator and the Claims Administrator, as applicable, after notice to the Plan Administrator or the Claims Administrator, as applicable, and a hearing thereon, and applicable law.

4. The Plan Administration Agreement further vests in the Claims Administrator complete authority to "control and exercise authority over the Avoidance Actions and Causes of

Action vested in Wind-Down Co pursuant to the Plan, and over the litigation, management and disposition thereof."

5.  The Plan implements a transaction between the Debtor and Paragraph Partners LLC (the "**Sponsor**"), pursuant to that certain Investment Agreement dated March 11, 2022, as amended (the "**Investment Agreement**").  Under the Investment Agreement, the Sponsor acquired the Transferred Entities (as defined in the Investment Agreement) but left behind all Excluded Assets (as defined in the Confirmation Order), which instead vested in Wind-Down Co on the Effective Date to be administered for the benefit of creditors by the Plan Administrator.[1]

6.  Under Section 1.42 of the Plan, those Excluded Assets included:

> (b) any and all claims and Causes of Action, whether known or unknown, contingent, liquidated or disputed, that the Debtor, the Noteholders, or the Notes Trustee **may have against any third-parties**, including, but not limited to, any current or prior officer, director, advisor, representative, consultant, or shareholder of the Debtor (subject to the releases provided in Section 7.02 of the Plan Investment Agreement), other than any claims and Causes of Action that the Debtor may have with respect to whether or not Yoel Goldman or Tzipporah Goldman have any ownership interests in any of the Transferred Entities (as defined in the Plan Investment Agreement), which shall be retained by the Reorganized Debtor and the Reorganized Debtor shall be authorized to assert any and all claims arising under any applicable law to recover any properties or property interests listed on the Schedule of Transferred Entities.

See Plan § 1.42 (emphasis added).

7.  Accordingly, on the Effective Date of the Plan, the Debtor's claims against third parties, with one narrow exception not relevant to this matter, became the property of Wind-Down Co, as administered by the Claims Administrator.

---

[1] "Plan Administrator" as defined in the Plan includes the Claims Administrator.  See Plan § 1.74.

8. Defendant Alexander M. Engelman ("**Mr. Engelman**" or the **"Defendant"**) is an individual who, upon information and belief, resides in Brooklyn, New York.

9. This is an adversary proceeding brought pursuant to Federal Rule of Bankruptcy Procedure 7001(1).

10. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, the Amended Standing Order of Reference M-431, dated January 31, 2023 (Preska, C.J.) and the Court's retention of jurisdiction pursuant to Section 11.1(i) of the Plan and paragraph 27 of the Confirmation Order. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to rule of Bankruptcy Procedure 7008 Plaintiff states that it consents to entry of final orders or judgment by the Bankruptcy Court.

11. Venue before the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**FACTUAL ALLEGATIONS**

12. On April 4, 2017, Mr. Engelman executed a promissory note in the principal amount of $3,000,000 (the "**Note**") in favor of Debtor. A true and correct copy of the Note is attached hereto as Exhibit A.

13. Pursuant to the Note, the Debtor distributed $3,000,000 to Mr. Engelman or an entity he controlled.

14. By its terms, the Note matured on April 4, 2018, with interest computed at an annualized rate of fifteen percent. *See* Ex. A.

15. On February 1, 2022, Debtor, through its attorneys, issued written demand to Mr. Engelman that he remit the full amount owed under the Note to the Debtor. A true and correct copy of that demand letter is attached hereto as Exhibit B.

16. As of the February 1, 2022 demand, the amount of debt owed was calculated as $5,205,000.00, consisting of $3,000,000 of outstanding principal and $2,205,000.00 in outstanding interest. *See* Ex. B.

17. Interest has continued to accrue since the February 1, 2022 demand, and, as of November 11, 2024, the amount owed under the Note is no less than $6,472,500 consisting of $3,000,000 of outstanding principal and $3,472,500 in outstanding interest.

## COUNT I – BREACH OF PROMISSORY NOTE

18. For paragraph 18 of Count I of its Complaint, Wind-Down Co, through the Claims Administrator, incorporates herein by reference paragraphs 1-17 as above though fully set forth herein.

19. The Note is a valid and existing contract duly executed by the Defendant, Mr. Engelman.

20. The Note contained an unequivocal and unconditional promise by Mr. Engelman to repay the principal and interest amounts on or before the maturity date of April 4, 2018. *See* Ex. A.

21. Pursuant to the unequivocal terms of the Note, Mr. Engelman waived any and all requirements of "presentment for payment, demand, notice of protest, notice of nonpayment, and notice of dishonor." *See* Ex. A.

22. Mr. Engelman has failed to pay the sums due under the Note.

## COUNT II – FRAUDULENT TRANSFER UNDER N.Y. DEBTOR & CREDITOR LAW § 273

23. For paragraph 23 of Count II of its Complaint, Wind-Down Co, through the Claims Administrator, incorporates herein by reference paragraphs 1-22 as above though fully set forth herein.

24. In defense to his repayment obligation under the Note, Mr. Engelman claims that the balance of the Note was reduced each time he was entitled to "distributions" from the business activity surrounding certain investment properties, such that his obligations were eventually extinguished.

25. Mr. Engelman's defense is based off of agreements with Yoel Goldman, executed in either 2013 or 2014, which, according to Mr. Engelman, entitle him to certain profits realized from various investment properties with Mr. Goldman.

26. Upon information and belief, Mr. Engelman never provided, either to Mr. Goldman or the Debtor, any consideration for his purported shares of profits in Mr. Goldman's real estate properties.

27. Mr. Goldman claims that Mr. Engelman may have paid funds into various property-level LLCs, but he does not know where, how, when, or in what amounts.

28. As evidence of his right to these "profits" Mr. Engelman points to a partnership agreement, written in Yiddish, which does not bear Mr. Engelman's signature, that Mr. Goldman claims to have been executed in either 2013 or 2014 (the *"Secret Partnership Agreement"*).

29. The Secret Partnership Agreement states that, notwithstanding the fact that Mr. Engelman may not appear on any capitalization table, membership list, manager list, or anywhere on the operating agreements for the various LLCs that held title to various properties, he is nonetheless entitled to profits generated by those LLCs with regard to those properties.

30. For instance, the Secret Partnership Agreement purports to document that Mr. Engelman has a 50% share of "591 Franklin LLC" and is therefore entitled to "profits and losses in accordance with all partnership laws" for that entity.

31. However, Mr. Engelman's name is nowhere to be found on the current operating agreement for 591 Franklin LLC.

32. Instead, that operating agreement lists only All Year Holdings Limited as the 100% owner and sole member of 591 Franklin LLC.

33. When Mr. Goldman was asked during his sworn deposition whether he ever disclosed to creditors, and specifically the Debtor's bondholders, the existence of the Secret Partnership Agreement, he refused to answer, invoking his Fifth Amendment rights.

34. When Mr. Goldman was asked during his sworn deposition whether he ever disclosed to anyone at All Year the existence of the Secret Partnership Agreement he refused to answer, invoking his Fifth Amendment rights.

35. Upon information and belief, Mr. Goldman did not ever disclose the Secret Partnership Agreement to anyone at the Debtor or the Debtor's creditors, including the Debtor's bondholders.

36. Instead, Mr. Goldman's intent was to shroud the Secret Partnership Agreement from view to hinder, delay, and/or defraud both the Debtor itself and its creditors.

37. Mr. Goldman revealed his plan to Mr. Engelman in their written correspondence during the negotiation of the Note.

38. Specifically, on March 9, 2017, Mr. Goldman wrote to Mr. Engelman that, as a condition to Mr. Engelman obtaining the $3,000,000 loan from the Debtor, that the two would "have to make something for the bonds. Like on which building the loan is officially."

39. Mr. Goldman refused to fund the loan until Mr. Engelman agreed to these conditions, writing "confirm or we cancel the wire. It's [sic] condition."

40. Mr. Engelman accepted, writing back "confirmed" on the same day.

41. There was no reason to "make something for the bonds" with regard to Mr. Engelman borrowing $3,000,000 except to disguise the loan from the Debtor's and its creditors' view.

42. Mr. Engelman contends that each time he was entitled to "profits" under the Secret Partnership Agreement, those profits were instead credited against his loan from the Debtor under the Note.

43. Mr. Engelman thus never made a single cash payment on the Note.

44. Instead, he alleges that the "profits" under the Secret Partnership Agreement eventually reduced the balance of the Note to zero.

45. Mr. Engelman alleges that these reductions to his loan balance were made beginning from March 9, 2017, when he claims he first received the funds, and had reduced his obligations by February 2, 2018, conveniently just before the Note would mature.

46. Wind Down-Co. only learned of these alleged "reductions" to Mr. Engelman's obligations under the Note during discovery in this case in 2024, and specifically during the deposition of Mr. Engelman on July 17, 2024.

47. Similarly Wind Down-Co. only recently learned of the Secret Partnership Agreement, which connects the alleged "reductions" to Mr. Goldman's personal obligations to Mr. Engelman, which was first disclosed during the deposition of Mr. Goldman in October 2024.

48. The Secret Partnership Agreement cannot possibly embody obligations of the Debtor as it both predates the Debtor's existence and is, on its face, an agreement between Mr. Goldman and Mr. Engelman personally.

49. Thus, if in fact Mr. Goldman caused the Debtor to reduce Mr. Engelman's loan balance, it represented the Debtor transferring something for nothing because the Debtor never owed Mr. Engelman those distributions.

50. Thus, if Mr. Goldman caused the Debtor to reduce Mr. Engelman's obligations under the Note to account for Mr. Goldman's personal obligations to Mr. Engelman under the Secret Partnership Agreement, each such reduction of liability was a fraudulent transfer designed specifically to hinder, delay, or defraud both the Debtor and its creditors.

51. The fraudulent intent is further established by the term in the Secret Partnership Agreement that explicitly acknowledges the scheme to keep Mr. Engelman's name off of the operating agreements for each LLC and therefore hide Mr. Goldman's promises to Mr. Engelman from any scrutiny by the Debtor's board or its creditors.

52. There was no reason for that term other than to make a secret promise to Mr. Engelman that Mr. Goldman would not have to reveal to anyone else.

53. The fraudulent intent is further established by the fact that Mr. Goldman invoked his Fifth Amendment rights when asked questions about whether he ever disclosed the Secret Partnership Agreement.

54. The fraudulent intent is further established by the fact that, if the Court were to credit the Secret Partnership Agreement as authentic and legally binding, that such transfers were to an insider, Mr. Engelman.

55. The fraudulent intent is further established by the fact that it was done to remove assets, specifically to remove the Debtor's right to enforce the Note against Mr. Engelman.

### COUNT III – IN THE ALTERNATIVE, UNJUST ENRICHMENT

56. For paragraph 56 of Count III of its Complaint, Wind-Down Co, through the Claims Administrator, incorporates herein by reference paragraphs 1-55 as above though fully set forth herein.

57. In the event the Court were to rule that no contract existed or that the Note was for any reason unenforceable or invalid, then Wind-Down Co, asserts a claim for unjust enrichment against Mr. Engelman.

58. On or about March/April 2017, Mr. Engelman received $3,000,000 from the Debtor.

59. Mr. Engelman received that $3,000,000 after having sought a loan from the Debtor and upon representations from Mr. Engelman that the $3,000,000 would accrue interest at 15% annually until he repaid it.

60. Accordingly, Mr. Engelman was enriched, at the Debtor's expense, and at a minimum of $3,000,000.

61. It is against equity and good conscience for Mr. Engelman to retain the $3,000,000 that he both sought and received but failed to repay

### COUNT IV – IN THE ALTERNATIVE, MONEY HAD AND RECEIVED

62. For paragraph 62 of Count IV of its Complaint, Wind-Down Co, through the Claims Administrator, incorporates herein by reference paragraphs 1-61 as above though fully set forth herein.

63. In the event the Court were to rule that no contract existed or that the Note was for any reason unenforceable or invalid, then Wind-Down Co, asserts a claim for money had and received against Mr. Engelman.

64. On or about March/April 2017, Mr. Engelman received $3,000,000 from the Debtor.

65. Mr. Engelman received that $3,000,000 after having sought a loan from the Debtor and upon representations from Mr. Engelman that the $3,000,000 would accrue interest at 15% annually until he repaid it.

66. Mr. Engelman benefitted from the receipt of that money, which he sought for the purposes of making investment returns.

67. It is against equity and good conscience for Mr. Engelman to retain the $3,000,000 that he both sought and received but failed to repay as he promised and represented he would.

WHEREFORE, Plaintiff WIND-DOWN CO, through the Claims Administrator, prays that this Court enter judgment against Defendant ALEXANDER ENGELMAN and requests:

(a) As to Count I, damages not less than $6,472,500, as well as all past, present, and future accrued and accruing interest, and post-judgment interest; an award in favor of Plaintiff for its attorneys' fees and costs;

(b) As to Count II, to the extent it is determined Mr. Goldman caused the Debtor to reduce Mr. Engelman's obligations under the Note in accordance with his Secret Partnership Agreement, an order voiding all such transfers/reductions in Mr. Engelman's liability;

(c) In the alternative, as to Counts III and IV, damages not less than $3,000,000, as well as all past, present, and future accrued and accruing interest, and post-judgment interest; an award in favor of Plaintiff for its attorneys' fees and costs;

(d) any further relief that this Court deems just and proper.

Dated: November 15, 2024
New York, New York

/s/ *Michael Friedman*
CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone: (212) 655-6000
Michael Friedman
David T. B. Audley
Eric S. Silvestri

*Counsel to the Plaintiff*