CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone: (212) 655-6000
Michael Friedman
David T. B. Audley
Eric S. Silvestri

*Counsel to AYH Wind Down LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                  :

In re:                                      :        Chapter 11

**ALL YEAR HOLDINGS LIMITED,**          :        Case No. 21-12051 (MG)

         Debtor.                     :

------------------------------------------------------------X

**AYH WIND DOWN LLC**, through Ofer Tzur and :
Amir Flamer, solely in their joint capacity as
Claims Administrator

         Plaintiff,

**ALEXANDER M. ENGELMAN,**           :        Adversary No.  23-01196-mg

         Defendant.

------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED ADVERSARY COMPLAINT**

**INTRODUCTION**

Plaintiff AYH Wind Down LLC's (*"Wind Down Co"* or *"Plaintiff"*) case against Defendant Alexander Engelman (*"Defendant"* or *"Mr. Engelman"*) began with the straightforward allegation that Defendant took a loan of $3,000,000 from the Debtor and failed to repay that promissory note (the *"Note"*) upon maturity several years ago.

On October 29, 2024, during the deposition of Yoel Goldman, Mr. Engelman disclosed, for the first time, a secret "partnership agreement," in Yiddish, purportedly between himself and Mr. Goldman from either 2013 or 2014, that he claims entitled him to a share of the "profits and losses" from several of Mr. Goldman's real estate investment properties, which profits he further claims were credited to the balance of the Note eventually reducing his obligations to zero. When Mr. Goldman was asked if he ever disclosed this "partnership agreement" to anyone at the Debtor or its creditors, Mr. Goldman invoked his Fifth Amendment rights and declined to answer.

Plaintiff then quickly moved to amend its complaint, primarily to assert fraudulent transfer claims. The Court granted Plaintiff leave to amend, over Defendant's objection, finding that Plaintiff's proposed Amended Complaint (the *"Amended Complaint"*) properly stated claims, and rejecting Defendant's arguments that the pleading would fail to satisfy the 12(b)(6) standard.. ECF No. 30. The Amended Complaint was then filed on December 18, 2024. Despite the Court's earlier ruling that the Amended Complaint "[t]he proposed Amended Complaint properly pleads the elements of both new causes of action," Plaintiff moved to dismiss under Rule 12(b)(6). Plaintiff's motion not only ignores the Court's previous ruling, it mistakes a Rule 12(b)(6) motion as an opportunity to attach evidence and argue the merits of the claims—even going so far as to attack claims he previously answered. Rule 12(b)(6) is unconcerned with the merits of a pleading, and in fact requires the Court to assume all well pleaded allegations as true. The only question before the Court therefore is whether those allegations, taken as true, plausibly assert claims upon which relief can be granted. As the Court has already ruled, they do. The motion should be denied.

## BACKGROUND

**I.    THE BANKRUPTCY CASE**

On December 14, 2021 (the *"Petition Date"*), the Debtor filed a voluntary bankruptcy petition under chapter 11 of title 11 of the United States Bankruptcy Code (the *"Bankruptcy*

*Code"*), which initiated the above-captioned Bankruptcy Case No. 21-12051 (MG) (the *"Main Case"*). Prior to the effectiveness of its plan of reorganization the Debtor was a British Virgin Islands real estate development holding company whose portfolio included approximately 1,648 residential units and 69 commercial units mainly located in Brooklyn, New York, which had, on the petition date, an aggregate net book value of over a billion dollars. Declaration of Assaf Ravid, Main Case ECF No. 4 at ¶ 6. As of the Petition Date, the Debtor had approximately $1.6 billion in outstanding funded debt obligations comprised of approximately $800 million in bonds and $760 million in property-level mortgage debt. *Id.*

The Debtor was founded on September 17, 2014 by its sole shareholder, Mr. Yoel Goldman (*"Mr. Goldman"*), who was the manager of the Debtor's business operations until shortly before the petition was filed. *Id.* at 6. Mr. Goldman's conduct and operation of the Debtor was and remains a source of tension, as he had, prior to the Petition Date, previously taken control of the Debtor's Board of Directors and authorized payments satisfying obligations of the Debtor he had also personally guaranteed. *Id.* at ¶ 10.

On January 31, 2023, following extensive and complex negotiations, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law, and Order (the *"Confirmation Order"*) (Main Case ECF No. 352) confirming the Third Amended Chapter 11 Plan of Reorganization (the *"Plan"*) (Main Case ECF No. 289). Paragraph 27 of the Confirmation Order specifically includes the Bankruptcy Court's retention of jurisdiction over "any rights, Claims, or Causes of Action held by or accruing to the Debtor, the Reorganized Debtor, the Plan Administrator, or Wind-Down Co[.]" Confirmation Order ¶ 27. As part of the Debtor's reorganization, the Plan transferred certain of the Debtor's legal claims to AYH Wind Down LLC, for the purpose of recovering additional property for distribution to creditors. Main Case ECF No. 289. Under the Plan Administration Agreement, which was executed in conjunction with the effectiveness of the

Plan, Ofer Tzur and Amir Flamer were jointly appointed "Claims Administrator" for the purposes of administering and managing AYH Wind Down LLC's prosecution of the Debtor's claims. The Plan Administration Agreement further vests in the Claims Administrator complete authority to "control and exercise authority over the Avoidance Actions and Causes Action vested in Wind-Down Co pursuant to the Plan, and over the litigation, management and disposition thereof." Accordingly, on the Effective Date of the Plan, the Debtor's claims against third parties generally became the property of AYH Wind Down LLC, as administered by the Claims Administrator. This adversary case (the *"Adversary Proceeding"*) is one of those claims formerly belonging to the Debtor.[1]

## II. THE ADVERSARY PROCEEDING THUS FAR

Plaintiff initiated this Adversary Proceeding for a single breach of contract count against Defendant Alexander Engelman on Novemebr 10, 2023. The Adversary Complaint alleged that on or around April 4, 2018, Mr. Engelman executed a promissory note (the *"Note"*) in favor of the Debtor in the original principal amount of $3,000,000 that he failed to repay, which obligation grew to what is now alleged to be no less than $6,472,500 consisting of $3,000,000 of outstanding principal and $3,472,500 in outstanding interest. *See* Adv. Pro. ECF No. 1 (Adversary Complaint).

Defendant filed his Answer on February 15, 2024. Adv. Pro. ECF No. 10. During his deposition, Mr. Engelman confirmed that he had in fact borrowed $3,000,000 at 15% interest, but that his obligation to repay those amounts were reduced each time he was owed distributions from the Debtor. Silvestri Decl. Ex. 1 (Engelman Dep. pp 23, 118–125). Mr. Engelman testified that he was a member of various property-level LLCs with Mr. Goldman and that is what entitled him to those distributions. *Id.* However, that was simply not true for a vast majority of the Debtor's

---

[1] Plaintiff's claim is analogous to that of a liquidating trustee. *See, e.g.*, *In re Residential Capital, LLC*, 519 B.R. at 600 ("The confirmed plan of liquidation expressly preserves RFC's claims and transfers them to the liquidating trust to prosecute . . . RFC's claims in this action are such transferred claims, and any funds recovered will be distributed to the creditors of the estate.").

property-level LLCs. Mr. Engelman's name is not on capitalization tables, member lists, manager lists, or in any of the Debtor's distribution ledgers, all of which the Debtor gathered and produced to Defendant following Defendant's testimony.

The full picture of Mr. Engelman's defense only came to light during the deposition of Mr. Yoel Goldman on October 29, 2024, during which Mr. Engelman's attorney showed Mr. Goldman a document that Mr. Engelman had not produced in discovery previously. Mr. Goldman testified that this agreement, which only Mr. Goldman signed in either 2013 or 2014, documented an undisclosed partnership with Mr. Engelman that, according to him, entitled Mr. Engelman to pro-rated shares of the "profits and losses" from various LLCs. Several things stand out regarding this undisclosed partnership agreement.

First, this undisclosed partnership agreement predates the Debtor's existence and therefore cannot possibly create obligations *of the Debtor* to Mr. Engelman. At best, it creates a personal obligation from Mr. Goldman to Mr. Engelman—a situation that is by now familiar to the Court from the *Silberstein* adversary case. Second, this undisclosed partnership agreement was, by its terms, secret. Specifically, it included a term that Mr. Engelman's share would not appear on any operating agreements or other documents, but that this agreement would nonetheless control over any other document in existence. Third, Mr. Engelman did not sign this agreement, only Mr. Goldman did. Fourth, and most tellingly, Mr. Goldman invoked his Fifth Amendment rights and refused to answer questions regarding whether he had ever disclosed this agreement to anyone at All Year or the Debtor's creditors, including its bondholders, immediately raising the specter of fraud, both on the Debtor and its creditors.

In light of these revelations and this newly disclosed document, Plaintiff sought to amend its complaint to attack the secret partnership agreement and the purported "profits and losses" that Mr. Engelman claims reduced his liability on the Note to zero as fraudulent transfers. On

December 18, 2024, the Court granted Plaintiff leave to amend, over Defendant's objection, finding that Plaintiff's proposed Amended Complaint properly stated claims, and rejecting Defendant's arguments that the proposed pleading would fail the Rule 12(b)(6) standard. ECF No. 30. The Amended Complaint was then promptly filed on December 18, 2024.

Despite the Court's earlier ruling that the Amended Complaint "The proposed Amended Complaint properly pleads the elements of both new causes of action," Plaintiff has now moved to dismiss under Rule 12(b)(6) in yet another vain attempt to stave off the inevitable—his liability to Plaintiff under a straightforward promissory note that he never repaid.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint and should be granted only where no relief could be granted under any set of facts that could be proved consistent with the allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To state a claim on which relief can be granted, a plaintiff must satisfy two conditions: (1) the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests; and (2) its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level. *See id.* Concerning allegations of fraud, Federal Rule of Civil Procedure 9(b) requires that such allegations be set forth with additional particularity. Fed. R. Civ. P. 9(b).

**ARGUMENT**

**I.    THE COURT ALREADY RULED THAT THE AMENDED COMPLAINT PROPERLY STATED CLAIMS**

On December 18, 2024, the Court granted Plaintiff's Motion to Amend the Adversary Complaint. ECF No. 30. In doing so, the Court rejected Defendant's arguments in opposition, which included the argument that amendment was futile because the Amended Complaint failed to state a claim under Rule 12(b)(6). ECF Nos. 30 ("Defendant's counsel argues . . . neither of the

added claims states a claim on which relief can be granted. **The Court disagrees**.") (emphasis added). Specifically, Defendant had argued that Plaintiff's proposed Amended Complaint failed the Rule 12(b)(6) standard, and therefore permitting Plaintiff to amend would be futile. ECF No. 27. The Court should reaffirm its prior holding and deny the motion for this reason alone.

## II.    THE AMENDED COMPLAINT PROPERLY STATES CLAIMS

Even if the Court were to entertain these arguments (again), it should find (again) that the Amended Complaint properly states claims for relief under Rule 12(b)(6). The Amended Complaint lays out robust and detailed allegations that, taken as true, conclusively establish that Defendant executed a promissory note, failed to pay it, and is hiding behind an obviously fraudulent scheme he concocted in secret to siphon the Debtor's funds into his own pocket and transform a $3,000,000 loan into a $3,000,000 gift. These allegations are backed by documents, including the executed promissory note, as well as deposition testimony. That testimony evidences persuasive and stark badges of fraud regarding Defendant's scheme, including Yoel Goldman *pleading the Fifth* instead of testifying about the details of his secret agreement to funnel $3,000,000 to Defendant, tell the Debtor's bondholders it was a loan, but agree on the side to never collect a penny of it.

### A.    The Amended Complaint States a Claim for Breach of Contract

The familiar elements of a breach of contract claim under New York law are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011). Therefore, if the Amended Complaint alleges facts that, assumed true, "plausibly suggest" that there is "any set of facts" under which Plaintiff would prevail on those elements, then the First Amended Complaint satisfies the

Rule 12(b)(6) standard. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Amended Complaint easily clears and in fact greatly surpasses this low bar.

As to the first element, the Amended Complaint alleges both the existence of the promissory note, gives the factual context to its creation, and attaches a copy of it that bears Defendant's signature. *See* ECF No. 31 (Amended Complaint) ¶¶ 12–17, Ex. A (the *"Note"*). It also attaches a demand letter sent to Defendant, which he did not contest at the time, further corroborating the existence and validity of the Note. The Note is facially valid, contains standard repayment terms as well as an interest rate that Defendant confirmed at his deposition. Nevertheless, Defendant's protests that he never signed the promissory note. Motion p. 4. However, New York law creates a presumption that the signature on a promissory note or other commercial paper is authentic and genuine. N.Y. U.C.C. Law § 3-307 ("When the effectiveness of a signature [on an instrument] is put in issue . . . the signature is presumed to be genuine."). Additionally, the Federal Rule of Evidence treats promissory notes as self-authenticating commercial paper. *See, e.g., U.S. V. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) (Commercial paper is self-authenticating under Federal Rule of Evidence 902); *In re Cook*, 457 F.3d 561, 566 (6th Cir. 2006) (promissory notes are self-authenticating); *Hummel v. Northwest Trustee Services, Inc.,* 180 F. Supp. 3d 798, 803 n.3 (W.D. Wa. 2016) ("Promissory notes are, of course, self-authenticating"); *Theros v. First American Title Ins. Co.*, 2011 WL 462564, *2 (W.D. Wa. 2011) ("Promissory notes are self-authenticating under Federal Rule of Evidence 902(9)."); *Pradhan v. Citibank, N.A.*, 2011 WL 90235, *5 n.4 (N.D. Cal. 2011) ("Furthermore, under Federal Rule of Evidence 902(9), promissory notes are self-authenticating.").

A motion to dismiss is not an opportunity to rebut that presumption, which is presumably why Defendant already answered this claim back in February 2024 by simply denying the allegation. Moreover, even if Defendant's protestations were taken at face value, they are not

sufficient to overcome the allegations of in the Amended Complaint that Defendant executed the Note, which must be taken as true under Rule 12(b)(6). Additionally, the fact that Defendant admits he received $3,000,000 from the Debtor further renders the Amended Complaint's breach of contract theory "plausible" as it would be highly unusual for the Debtor to send him $3,000,000 if he had not executed an agreement to pay it back. *See* Motion p. 5 ("Defendant borrowed $3,000,000").

As to the reaming elements, Plaintiff's performance, Defendant's breach, and damage, those too are properly and sufficiently alleged. The Amended Complaint alleges that the Debtor advanced the funds, a fact that Defendant admits, which establishes the Debtor's performance. Am. Compl. ¶ 13; Motion p. 5 ("Defendant borrowed $3,000,000). The Amended Complaint alleges that Defendant has failed to repay the Note despite demand, which establishes both beach and damage. Am. Compl. ¶¶ 14–22. Accordingly, all elements of Plaintiff's breach of contract claim are sufficiently pleaded and satisfy the Rule 12(b)(6) standard.

      B.      The Amended Complaint States a Claim for Fraudulent Transfer under N.Y. Debtor and Creditor Law § 276

As described above, and as alleged in the Amended Complaint, Defendant's primary defense in this case is now that he never actually had to repay the Note because he was entitled to economic distributions from Yoel Goldman on various real estate deals. Am. Compl. ¶¶ 24-25, 28-29, 42-44, 50. In other words, Yoel Goldman owed Defendant money based on real estate investment deals between Mr. Goldman and Defendant. According to both Goldman and Defendant, Goldman paid Defendant **with the Debtor's assets**, namely the Debtor's right to receive payment from Defendant under the Note. This was a great plan for everyone except the Debtor, which, according to Defendant, forwent the right to collect $3,000,000 in exchange for nothing. Am. Compl. ¶¶ 24-25, 28-29, 42-44, 50. This is the heart of Plaintiff's fraudulent transfer theory—

Goldman siphoned the Debtor's assets away in order to pay his own personal debts to Defendant. Accordingly, and assuming only Goldman could effectively force the Debtor to forgive Defendant's debt this way, those credits to Defendant's loan balance represent fraudulent transfers that should be unwound and his loan balance should be reinstated. Defendant does not disagree with any of these allegations, and his Motion even admits they are allegations are true. Motion p. 6 ("While Plaintiff's loan repayment narrative may be true . . ."). However, Defendant protests that those true allegations do not state a claim under N.Y. Debtor & Creditor Law § 276.

As these transfers took place before April 2020 when the Debtor & Creditor Law was amended, the controlling law is the pre-April 2020 version of § 276. To state a claim under § 276, Plaintiff must allege a plausible set of facts that a conveyance was made with the actual intent to hinder, delay, or defraud either present or future creditors, which may rely on certain badges of fraud sufficient to infer such intent. *SSC NY Corp. v. Computershare Inc.*, 224 A.D.3d 620, 621, 206 N.Y.S.3d 282, 284 (2024); N.Y. DEBT. & CRED. LAW § 276 (effective until April 2020). Such badges include "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance." *SSC NY Corp. v. Computershare Inc.*, 224 A.D.3d 620, 621, 206 N.Y.S.3d 282, 284 (2024). The Amended Complaint plainly sets out multiple and damning badges of fraud with regard to the scheme to funnel $3,000,000 to Defendant.

First and most indicative of fraud, the Amended Complaint points out that Yoel Goldman asserted his Fifth Amendment rights rather than discuss this scheme. Am. Compl. ¶ 33 ("When Mr. Goldman was asked during his sworn deposition whether he ever disclosed to creditors, and specifically the Debtor's bondholders, the existence of the Secret Partnership Agreement, he

refused to answer, invoking his Fifth Amendment rights."); *United States v. 4003–4005 5th Ave.*, 55 F.3d 78, 82 (2d Cir.1995) (Fifth Amendment assertions can be relied upon for adverse inferences in civil cases). There is scant better evidence of intent to defraud creditors than to assert that revealing whether he disclosed this scheme to the Debtor's Bondholders would open Goldman up to criminal liability. (holding that in civil cases the assertion of a Fifth Amendment right can be used to infer malintent).

The Amended Complaint also ties Goldman's refusal to incriminate himself to Defendant when it alleges that Goldman shared his scheme with Defendant in an email on March 9, 2017, stating that the two would "have to make something for the bonds. Like on which building the loan is officially." Am. Compl. ¶ 38. As alleged in the Amended Complaint, Goldman made this a "condition" of the loan, informing Defendant to confirm his understanding or he would cancel it, to which Defendant wrote back "confirmed." Am. Compl. ¶¶ 39–40. As further alleged in the Amended Complaint, there was no reason to shroud this loan from the view of creditors, such as the Bondholders, unless the intent was to defraud them. Am. Compl. ¶ 41. Assuming these allegations as true, they plausibly establish that: (1) Goldman stated his intent to hide the loan from his bondholders by falsely associating it with a real estate property, (2) that he then shared that plan with Defendant, and (3) that Defendant agreed in writing to the plan in order to receive $3,000,000 of the Debtor's funds. Am. Compl. ¶¶ 33–42.

The Amended Complaint goes on to describe the scheme with particularity, focusing on the fact that Goldman and Defendant both agreed to keep his name off of any cap tables, operating agreements, or other documents but nonetheless promise Defendant distributions on the side. The Amended Complaint describes the specific term Goldman and Defendant used to accomplish this when it alleges that "the Secret Partnership Agreement states that, notwithstanding the fact that Defendant may not appear on any capitalization table, membership list, manager list, or anywhere

on the operating agreements . . . he is nonetheless entitled to profits generated by those LLCs with regard to those properties." Am. Compl. ¶ 29. The Amended Complaint provides a specific example of the provision in action: "the Secret Partnership Agreement purports to document that Mr. Engelman has a 50% share of "591 Franklin LLC" and is therefore entitled to "profits and losses in accordance with all partnership laws" for that entity. However, Mr. Engelman's name is nowhere to be found on the current operating agreement for 591 Franklin LLC. Instead, that operating agreement lists only All Year Holdings Limited as the 100% owner and sole member of 591 Franklin LLC." Am. Compl. ¶¶ 30–32. These are precisely the type of specific allegations sufficient to allege a fraudulent scheme under Federal Rule of Civil Procedure 9(b) as they "inject precision" and "a measure of substantiation" into those allegations and the claim itself. *Drenis v. Haligiannis*, 452 F.Supp.2d 418, 429 (S.D.N.Y. 2006); *Seville Indus. Machinery Corp v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

In addition to the fact that Goldman refused to incriminate himself criminally rather than discuss this scheme, that the scheme to shroud Goldman's monetary promises to Defendant from the view of any creditor or co-investor on any property, that the scheme was shared over email and confirmed by Defendant, and that Goldman then proceeded to enact the scheme by failing to ever enforce the note, the Amended Complaint alleges yet additional badges of fraud, including that Defendant was apparently an insider by virtue of the undisclosed partnership agreement and that the scheme was aimed at removing assets from the Debtor, namely its right to collect on Defendant's note. Am. Compl. ¶¶ 51–55 ("The fraudulent intent is further established by the fact that, if the Court were to credit the Secret Partnership Agreement as authentic and legally binding, such transfers were to an insider" and "by the fact that it was done to remove the Debtor's right to enforce the Note.").

Defendants arguments for dismissal range from the inapplicable to the mistaken. For instance, Defendant protests that these are "legitimate distributions owed to [Defendant]" and that "Though Plaintiff claims that these acts constitute fraudulent transfers, in actuality this is not the case." Motion pp. 6–7. Once again, these are merits arguments. On a motion to dismiss, Defendant is not permitted to simply discard the Amended Complaint's specific and detailed allegations. The Court must accept those allegations as true.

Elsewhere Defendant attempts to rebut allegations by attaching a declaration refuting the allegation that he never paid any consideration to Goldman to become a real estate investor. This too, is improper merits argument and incompatible with Rule 12(b)(6). Rule 12(b)(6) does not permit the consideration of any evidence beyond the allegations of the Complaint, what is incorporated into the Complaint and matters on which judicial notice may be properly taken. *Provepharm, Inc. v. Akorn, Inc.*, No. 17-CV-7087(SJF)(AKT), 2019 WL 2443185, at *8 (E.D.N.Y. June 11, 2019). Factual refutations in declarations like the one Defendant seeks to have considered now are precisely the kind of evidence that Rule 12(b)(6) excludes.

Moreover, Defendant's argument is self-defeating and actually supports Plaintiff's fraudulent transfer theory. As Defendant admits he did not enter into agreements with *the Debtor*, he entered into agreements with *Goldman personally*. Motion pp. 9–10. ("[Defendant's] investment [was] into **each of Goldman's** entities.") (emphasis added). This damning admission is repeated across the Motion. Motion p. 9 ("**Goldman approached Engelman** and asked if he wanted to partner with him to purchase the property") ("Engleman agreed, and . . . invested **with Goldman**") ("Engelman told Goldman that . . . due to his investment into 82 Jefferson LLC and other deals **with Goldman** . . .he should instead credit the Loan balance.") (emphasis added). There is no mention anywhere in the Motion that Defendant invested *with the Debtor* or that he was owed distributions *from the Debtor*. This makes sense, given that the undisclosed partnership agreement

that documented this scheme does not mention the Debtor, only Goldman and Defendant personally. Am. Compl. ¶ 28. Even if Defendant's evidence and declaration were considered, the fact that he was investing with Goldman personally only to be paid back with the Debtor's assets is not the fatal factual blow that Defendant appears to think it is.

Defendant further argues that "Plaintiff has failed to show that Goldman knew about the creditor's claim." That argument fails for at least three reasons. First, Plaintiff is not required to "prove" anything on a motion to dismiss. Second, § 276 prohibits intentional fraudulent transfers as to present "or future" creditors. N.Y. DEBT. & CRED. LAW § 276 (effective until April 2020). Third, the allegations of the Amended Complaint do, in fact, show that Goldman knew about the Debtor's creditors because he wrote an email to Defendant on March 9, 2017 stating they would have to disguise the loan by attaching it to an investment property "for the bonds." Am. Compl. ¶ 38.

C. The Amended Complaint States Alternative Claims

The Amended Complaint alleges two claims in the alternative: unjust enrichment and money had and received. Defendant argues each of these is inappropriate in light of the fact that the parties have a contractual relationship in the form of the Note. Motion pp. 12–13. Setting aside the fact that Defendant spends several pages of the Motion disputing the Note, alleging a contractual claim in parallel with alternative quasi contractual or equitable claims is routine and permitted under the Federal Rules of Civil Procedure. Fed. R. Civ. P. 8(d); *Cnty. of Monroe v. Siemens Indus., Inc.*, 734 F. Supp. 3d 244, 252 (W.D.N.Y. 2024) ("The principle is well established, however, that a party may plead inconsistent or mutually exclusive theories of recovery in the alternative."). That is why this claim is, in fact, explicitly pleaded in the alternative, with a specific allegation that it arises only "[i]n the event the Court were to rule that no contract existed or that the Note was for any reason unenforceable or invalid." Am. Compl. ¶¶ 57, 63. The

remainder of the Motion's discussion of these alternative claims once again misses the mark by attempting to rebut the allegations that Defendant kept the money he received or benefitted from it. For the reasons discussed above, those arguments are not permitted on a motion to dismiss. The Amended Complaint plainly states the elements of both unjust enrichment and money had and received under New York law, which Defendant himself cites. *Compare In re CIL Ltd.*, 582 B.R. 46, 123 (Bankr. S.D.N.Y. 2018) (unjust enrichment requires "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered") *with* Am. Compl. ¶¶ 56–61l; *compare Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) (money had and received requires (1) defendant received money belong to plaintiff, (2) defendant benefitted from the receipt of the money, and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money") *with* Am. Compl. ¶¶ 62–67. Accordingly, Plaintiff has properly alleged a plausible set of facts that, in the alternative to its breach of contract claim, would otherwise entitle it to relief under theories of unjust enrichment and money had and received.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss the First Amended Adversary Complaint and grant such other relief as may be just and proper.

DATED: February 21, 2025

Respectfully submitted,

CHAPMAN AND CUTLER LLP

By: _____
Eric Silvestri

Eric Silvestri (admitted *pro hac vice*)

C<small>HAPMAN AND</small> C<small>UTLER LLP</small>
320 South Canal
Chicago, Illinois 60606
(312) 845-3000
silvest@chapman.com