**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
: 
In re: : Chapter 11
:
ALL YEAR HOLDINGS LIMITED, : Case No. 21-12051 (MG)
:
        Debtor. :
:
:
-----------------------------------------------------------X
AYH Wind Down LLC, through Ofer Tzur and : Trial Declaration of Asaf Ravid
Amir Flamer, solely in their joint capacity as :
Claims Administrator :
:
        Plaintiff, :
:
ALEXANDER M. ENGELMAN, : Adversary No. 23-01196-mg
:
        Defendant. :
:
-----------------------------------------------------------X

### DECLARATION OF ASAF RAVID IN LIEU OF DIRECT TESTIMONY FOR TRIAL

    I, Assaf Ravid, hereby declare under penalty of perjury to the best of my knowledge, information, and belief, the following in support of Plaintiff AYH Wind Down LLC's (*"Plaintiff"*) claims against Defendant Alexander Engelman (*"Mr. Engelman"* or *"Defendant"*), which is submitted in lieu of my direct testimony for the trial currently scheduled for October 20–21, 2025:

    1.    On March 4, 2021, I was retained as the Chief Executive Officer and Chief Restructuring Officer (the *"CRO"*) of All Year Holdings Limited (*"All Year"*).

    2.    All Year operated as a holding company that, through its direct and indirect subsidiaries, focused on the development, construction, acquisition, leasing, and management of residential and commercial income producing properties in Brooklyn, New York.

    3.    Earlier, in February 2017, All Year issued Series C Debentures (the "*Series C Bonds*" and the holders thereof the *"Series C Bondholders"*) in the original principal amount of

NIS 617,970,000 pursuant to a Deed of Trust dated February 19, 2017 (the *"Deed of Trust"*) between All Year and Mishmeret Trust Company Ltd., solely in its capacity as Trustee for the bondholders (the *"Trustee"*).

4.     On December 14, 2021, All Year filed with this Court a voluntary petition for relief under chapter 11 of the United States Code.

5.     I am currently the Plan Administrator of AYH Wind Down LLC (*"Plaintiff"* or *"Wind Down Co."*),[1] which was created pursuant to the Debtor's confirmed Third Amended Chapter 11 Plan of Reorganization [Bankr. ECF No. 289] (the *"Plan"*) and vested with rights to bring this lawsuit under that certain Plan Administration Agreement executed in conjunction with the effectiveness of the Plan (the *"Plan Administration Agreement"*).

6.     As Plan Administrator of Wind Down Co., I am familiar with the facts and circumstances set forth herein, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true.

7.     I am also knowledgeable and familiar with the Debtor's business and financial affairs. The facts set forth here, including about the Debtor's business, its records, and its finances, are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor who are either working or previously worked under my supervision, and/or my opinion based on experience, knowledge, and information concerning the Debtor.

---

[1]    Wind Down Co. is the entity that succeeded to All Year Holdings Ltd.'s (*"Debtor"*) interests in YG WV LLC pursuant to that certain Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited, dated December 9, 2022, as confirmed by that certain Confirmation Order entered January 31, 2023. *See In re All Year Holdings Limited*, Case No. 21-12051(MG) (the *"Main Case"*), ECF No. 352.

**The Debtor's Business Records and Evidence in this Case**

8. Based on my experience as CEO and CRO of the Debtor, the Debtor's business records, including the Note, the accounting records, and financial data, appear to be maintained at or near the time those records are created by either those with knowledge of those records or from information from someone with such knowledge. Further, it is my experience that the maintenance of such records is part of the Debtor's regularly conducted business activity.

9. Plaintiff's Trial Exhibits, denoted as PX1–4 and PX8–45, which are referenced throughout this declaration, are such business records of the Debtor.

**Nature of the Claims Against Mr. Engelman**

10. This lawsuit is brought by Wind Down Co. through Ofer Tzur and Amir Flamer solely in their joint capacity as Claims Administrator on behalf of Wind Down Co. (the *"Claims Administrator"*) under the Plan and the Plan Administration Agreement.

11. Under that Plan Administration Agreement, a true and correct copy of which is attached to the Plan, Ofer Tzur and Amir Flamer were jointly appointed Claims Administrator. Specifically, the Plan Administration Agreement states:

> The Administrators hereby (a) accept their respective appointments as the Plan Administrator and the Claims Administrator as of the Effective Date, and (b) agree to observe and perform all duties and obligations imposed upon each of the Administrators under this Agreement, the Plan and the Confirmation Order, and other orders of the Bankruptcy Court as made expressly applicable to the Plan Administrator and the Claims Administrator, as applicable, after notice to the Plan Administrator or the Claims Administrator, as applicable, and a hearing thereon, and applicable law.

12. The Plan Administration Agreement further vests in the Claims Administrator complete authority to "control and exercise authority over the Avoidance Actions and Causes of Action vested in Wind Down Co. pursuant to the Plan, and over the litigation, management and disposition thereof."

13. Generally speaking, the Plan implements a transaction between the Debtor and Paragraph Partners LLC (*"Sponsor"*), pursuant to an Investment Agreement dated March 11, 2022, as amended (the *"Investment Agreement"*). Under the Investment Agreement, the Sponsor acquired the Transferred Entities (as defined in the Investment Agreement) but left behind all Excluded Assets (as defined in the Confirmation Order), which vested in Wind Down Co. on the Effective Date to be administered for the benefit of creditors by the Plan Administrator.[2]

14. This lawsuit and its claims are examples of those that vested in Wind Down Co. as Excluded Assets following Confirmation of the Plan as described above.

**The Promissory Note**

15. Wind Down Co.'s claims are centered on a promissory note dated April 4, 2017, in favor of the Debtor in the principal amount of $3,000,000 (the *"Note"*). *See* PX1.

16. Pursuant to the Note, the Debtor distributed $3,000,000 to Mr. Engelman on April 4, 2017. *See* PX3.

17. By its terms, the Note matured on April 4, 2018.

18. Debtor did not receive any payment on the Note at maturity, and has not received any payment on the Note since, despite demand.

19. The unpaid balance has continued to accrue interest at the stated annual rate of 15%, resulting in a balance of, as of October 20, 2025 (the date of this trial), $6,901,250. That balance remains unpaid and continues to accrue interest. Accordingly, Mr. Engelman owes the Debtor those funds, payable immediately.

20. PX1 is a true and correct copy of the Note. I am aware that Mr. Engelman alleges the Note does not bear his actual signature. As explained below, it is my view that Mr. Engelman

---

[2] "Plan Administrator" as defined in the Plan includes the Claims Administrator. *See* Plan § 1.74.

signed the Note, however, as a threshold matter, I can confirm and attest that PX1 is a true and correct copy of the document that was located in the Debtor's files after I assumed the role of CEO, CRO, and later Plan Administrator.

21.     With regard to the signature, I believe it to be Mr. Engelman's for multiple reasons. First, having reviewed Mr. Engelman's declarations in this case as well as his deposition testimony, he confirmed that: (1) borrowed $3,000,000 from the Debtor, (2) that he received that $3,000,000 from the Debtor, (3) that he borrowed this $3,000,000 at interest rate of 15%, *i.e.*, and (4) that all of this took place around April 4, 2017 *i.e.*, the date of the Note. *See* PX5 (Mr. Engelman's February 15, 2024 declaration admitting he borrowed these funds from the Debtor).

22.     Second, and in addition to Mr. Engelman's concessions, the Debtor's records confirm that the Debtor sent Mr. Engelman this $3,000,000. PX3 is a true and correct copy of the Debtor's bank account ledger for an account it held at Signature Bank, which confirms the $3,000,000 sent to "Mercer Jordan" on or about April 4, 2017. I understand that Mercer Jordan Ventures LLC to be a limited liability company associated with Mr. Engelman.

23.     Third, Mr. Engelman never disputed the Note when Debtor first made demand for it in 2022. PX2 is a true and correct copy of the demand letter that Plaintiff instructed its counsel to send to Mr. Engelman for immediate payment under the Note in 2022. As far as I am aware, Mr. Engelman never responded to the demand letter, and never alleged that he had not signed the Note. The first I had the allegation that it was not his signature was after Wind Down Co filed this lawsuit.

**Mr. Engelman's "Repayment" Theory**

24.     I understand that, although Mr. Engelman admits he never made any cash payments on the Note, he alleges that the Debtor forwent real estate investment distributions that Mr. Engelman claims he was entitled to in lieu of payment.

25. Specifically, it is my understanding that Mr. Engelman claims he was an "investor" in the following real estate development vehicles:

- 574 Broadway LLC
- 277 Classon LLC
- 591 Franklin LLC
- 608 Franklin LLC
- 82 Jefferson LLC
- 892 Myrtle LLC
- 461 Park Place LLC
- 469 Park Place LLC
- "192 Park" (as explained below, this is not a Debtor property)
- 79 South 6th Street LLC; and
- 247 Troutman LLC

26. After learning of this allegation, I investigated it by reviewing the Debtor's records and commercial activity for each of these real estate investments as well as the Debtor's financial and accounting records related to any distributions to investors on those properties. What follows below are the results of Wind Down Co.'s investigation, broken down by real estate investment.

**A. 574 Broadway LLC**

27. The Debtor has no record of Mr. Engelman ever making a financial investment in 574 Broadway LLC, either in cash or other consideration.

28. Mr. Engelman is not a member of 574 Broadway LLC. Based on PX14, the Amended and Restated Operating Agreement for 574 Broadway LLC, the members of 574 Broadway LLC are the Debtor and NY Supreme Holdings LLC. Two individuals signed this operating agreement on behalf of NY Supreme Holdings LLC: Mendy Deutch and Aron Weber. These are the also the same members listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

29. Later filed tax returns for 574 Broadway LLC confirm Messrs. Deutch and Weber's membership in 574 Broadway LLC. *See* PX15.

-6-

30. 574 Broadway underwent a refinance transaction on or about September 14, 2017. PX16, an Asset Distribution Accounting Entry for 574 Broadway LLC, catalogues distributions to Mr. Duetch and Mr. Weber on September 14, 2017 in the amount of $97,450.27 for each (with a one cent difference in those distributions). The Debtor has no records showing any such distribution was owed to Mr. Engelman. *See* PX16; PX 17.

B. **277 Classon LLC**

31. The Debtor has no record of Mr. Engelman ever making a financial investment in 277 Classon LLC, either in cash or other consideration.

32. Mr. Engelman is not a member of 277 Classon LLC. Based on PX32, the Amended and Restated Operating Agreement for 277 Classon LLC, the only member of 277 Classon LLC is the Debtor. This is the same information listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

33. Later filed tax returns for 277 Classon LLC indicate that at some point Mr. Goldman and his wife became members of 277 Classon LLC. *See* PX33. However, Mr. Engelman does not appear on any of 277 Classon LLC's tax returns in the Debtor's possession.

34. 277 Classon LLC underwent a refinance transaction around December 11, 2017, and the Debtor made a journal entry in its accounting records for a distribution of $450,000 on December 12, 2017. *See* PX34; PX35. The Debtor has no records showing any such distribution was owed to Mr. Engelman.

C. **591 Franklin LLC**

35. The Debtor has no record of Mr. Engelman ever making a financial investment in 591 Franklin LLC, either in cash or other consideration.

36. Mr. Engelman is not a member of 591 Franklin LLC. Based on PX18, the Amended and Restated Operating Agreement for 591 Franklin LLC, the only member of 591 Franklin LLC

is the Debtor. This is the same information listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

37.     Later filed tax returns for 591 Franklin LLC indicate that at some point Mr. Goldman and his wife became members of 591 Franklin LLC. *See* PX19. However, Mr. Engelman does not appear on any of 591 Franklin LLC's tax returns in the Debtor's possession.

38.     591 Franklin LLC underwent a refinance transaction on or about September 14, 2017, and the Debtor made a journal entry in its accounting records for a distribution on September 14, 2017. *See* PX20. The Debtor has no records showing any such distribution was owed to Mr. Engelman.

**D.  608 Franklin LLC**

39.     The Debtor has no record of Mr. Engelman ever making a financial investment in 608 Franklin LLC, either in cash or other consideration.

40.     However, it does appear that Mr. Engelman owns a 7.5625% stake in 608 Franklin LLC, which at one point appears to be estimated at a value of $123,865. *See* PX44; PX45.

41.     Even assuming that Mr. Engelman would have been entitled to a 7.5625% pro-rated share for any distributions, that amount would not be anywhere near the ~$1.3 million that I understand he is claiming as a credit to his loan obligation on the basis of this property.

**E.  82 Jefferson LLC**

42.     The Debtor has no record of Mr. Engelman ever making a financial investment in 82 Jefferson LLC, either in cash or other consideration.

43.     Mr. Engelman is not a member of 82 Jefferson LLC. Based on PX13, the Amended and Restated Operating Agreement for 82 Jefferson LLC, the only members of 82 Jefferson LLC are the Debtor itself and 82 Jefferson Holdings LLC. These are the also the same members listed

-8-

in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

44. It does appear that Mr. Engelman signed the Amended and Restated Operating Agreement for 82 Jefferson LLC on behalf of 82 Jefferson Holdings LLC, but it is not clear why as the Debtor has no records suggesting he is a manager or even a member of 82 Jefferson Holdings LLC. *See* PX13.

45. 82 Jefferson LLC engaged in a refinance transaction on or about December 9, 2016, but no records suggest that distributions from that refinance transaction should have flowed to Mr. Engelman personally such that they could have substituted as payment on the Note.

46. As such, even assuming that in 2017 either Mr. Goldman or someone from the Debtor informed Mr. Engelman that his debt under the Note was reduced on the basis of a transaction or distribution related to 82 Jefferson LLC, that would have been false.

**F. 892 Myrtle (Y&M Management LLC)**

47. The Debtor's investment in the property located at 892 Myrtle was managed by an entity called Y&M Management LLC.[3]

48. The Debtor has no record of Mr. Engelman ever making a financial investment in 892 Myrtle or in Y&M Management LLC, either in cash or other consideration.

49. Mr. Engelman is not a member of Y&M Management LLC. Based on PX36, the Amended and Restated Operating Agreement for Y&M Management LLC, the only members of Y&M Management LLC are the Debtor and Sam Neustn. This is the same information listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

---

[3] *See* PX36 (identifying the purpose of Y&M Management LLC as purchasing and holding property at 892 Myrtle).

50. 892 Myrtle underwent a refinance transaction on or about February 9, 2018, and the Debtor made a journal entry in its accounting records for a distribution of $2,118,956.28 on February 9, 2018. *See* PX38. The Debtor has no records showing any such distribution was owed to Mr. Engelman.

**G. 461 Park Place LLC**

51. The Debtor has no record of Mr. Engelman ever making a financial investment in 461 Park Place LLC, either in cash or other consideration.

52. Mr. Engelman is not a member of 461 Park Place LLC. Based on PX21, the Amended and Restated Operating Agreement for 461 Park Place LLC, the only members of 461 Park Place LLC are the Debtor and Sam Neustien. This is the same information listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

53. Later filed tax returns for 461 Park Place LLC indicate that at some point Mr. Goldman, rather than the Debtor, was listed as a member of 461 Park Place LLC alongside Mr. Neustien. *See* PX22. However, Mr. Engelman does not appear on any of 461 Park Place LLC's tax returns in the Debtor's possession.

54. 461 Park Place LLC underwent a refinance transaction on or about September 18, 2017, and the Debtor made a journal entry in its accounting records for a distribution of $216,673.56 to Mr. Neustien on or around September 25, 2017. *See* PX23; PX24. The Debtor has no records showing any such distribution was owed to Mr. Engelman.

**H. 469 Park Place LLC**

55. The Debtor has no record of Mr. Engelman ever making a financial investment in 469 Park Place LLC, either in cash or other consideration.

56. Mr. Engelman is not a member of 469 Park Place LLC. Based on PX25, the Amended and Restated Operating Agreement for 469 Park Place LLC, the only members of 469 Park Place LLC are the Debtor and Sam Neustien. This is the same information listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

57. 469 Park Place LLC underwent a refinance transaction on or about September 18, 2017, and the Debtor made a journal entry in its accounting records for a distribution of $198,283.13 to Mr. Neustien on September 25, 2017. *See* PX26; PX27. The Debtor has no records showing any such distribution was owed to Mr. Engelman.

**I. "192 Park"**

58. The Debtor has no records of ever owning a property referred to as "192 Park."

**J. 79 South 6th Street LLC**

59. The Debtor has no record of Mr. Engelman ever making a financial investment in 79 South 6th Street LLC, either in cash or other consideration.

60. Mr. Engelman is not a member of 79 South 6th Street LLC. Based on PX40, the Amended and Restated Operating Agreement for 79 South 6th Street LLC, the only members of 79 South 6th Street LLC are the Debtor and Moses Guttman. This is the same information listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

61. 79 South 6th Street LLC underwent a refinance transaction on or about April 1, 2018, and the Debtor made a journal entry in its accounting records for a distribution on April 1, 2018. *See* PX42. The Debtor has no records showing any such distribution was owed to Mr. Engelman.

62. The Debtor made additional journal entries in its accounting records for distributions from 79 South 6th Street LLC on or around July 23, 2018 ($20,000) and October 11, 2018 ($7,609.63). *See* PX43. The Debtor has no records showing any such distributions were owed to Mr. Engelman.

**K. 247 Troutman LLC**

63. The Debtor has no record of Mr. Engelman ever making a financial investment in 247 Troutman LLC, either in cash or other consideration.

64. Mr. Engelman is not a member of 247 Troutman LLC. Based on PX28, the Amended and Restated Operating Agreement for 247 Troutman LLC, the only members of 247 Troutman LLC are the Debtor and YME Holdings LLC. This is the same information listed in PX8, a record from the Debtor breaking down ownership stakes and percentages in its real estate investments.

65. 247 Troutman LLC underwent a refinance transaction on or about November 16, 2017, and the Debtor made a journal entry in its accounting records for a distribution on November 16, 2017. *See* PX30. The Debtor has no records showing any such distribution was owed to Mr. Engelman.

**Mr. Goldman's History with the Debtor**

66. Based on my experience serving as CEO, CRO, and Plan Administrator, the Debtor was insolvent or about to become insolvent on or around October 1, 2020, due in large part to payment defaults on hundreds of millions of dollars in loans, including the bonds.

67. My investigation undertaken pursuant to Bankruptcy Rule 2004 as part of my duties revealed that beginning in 2019 the Debtor's cash position was being artificially inflated by an unauthorized line of credit that Mr. Goldman opened with UBS Bank that, without the knowledge

or consent of the Debtor's Board of Directors, was secured by a lien on certain of the Debtor's cash assets.

68. The Debtor did not have the funds to repay this line of credit with UBS Bank, and Mr. Goldman eventually engaged in additional unauthorized borrowing, backed by confessions of judgment, to repay the line of credit, which eventually led to the Debtor filing its bankruptcy petition.

69. Shortly after the Debtor defaulted on its bond obligations on November 29, 2020, it engaged in extensive negotiations with its creditors and other constituents to explore restructuring options, given that it was unable to service its debt at the time.

70. During this period, which was prior to the Debtor's bankruptcy filing, the Debtor's Board of Directors negotiated with Mr. Goldman to relinquish his control of the Debtor. These steps were taken after Mr. Goldman had previously taken control of the board and authorized the Debtor to make payments on obligations that he had also personally guaranteed without proper approvals.

Dated: New York, New York
       October 14, 2025

_____
Assaf Ravid